# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JEROME S. CAPPS,                    :

     Plaintiff,                    :

                                          Case No. 3:11cv00182

 vs.                              :

                                          District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,                  :     Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,            :

     Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

Plaintiff Jerome S. Capps filed an application for Disability Insurance Benefits with the Social Security Administration.  Through his application, Plaintiff asserted that he was eligible to receive such benefits, beginning on January 18, 2005, essentially because his health problems, and resulting disability, prevented him from doing not only his most recent job but also other jobs that are available in the regional or national economies. Plaintiff has many health problems:  obesity, chronic obstructive pulmonary disease, degenerative disc disease in his lumbar spine, osteoarthritis in his right hip, degenerative joint disease in his knees, osteoarthritis in his shoulders, and depression.

---

[1]  Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

The Social Security Administration denied Plaintiff's application mainly through the written decision of Administrative Law Judge (ALJ) Thomas R. McNichols, II, who concluded that Plaintiff was not eligible for benefits because he was not under "disability" within the meaning of the Social Security Act.  (Doc. #7, PageID at 39-53).  Believing he was, and is, under a benefits-qualifying "disability," Plaintiff brings the present case challenging ALJ McNichols' decision.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record (Doc. #7), and the record as a whole.  Plaintiff seeks an Order remanding, at minimum, this matter to the Social Security Administration for further proceedings.  The Commissioner seeks an Order affirming ALJ McNichols' decision.

This Court has subject matter jurisdiction over the parties' dispute.  *See* 42 U.S.C. §405(g).

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony

Social Security Regulations recognize that a person's ability to obtain and perform a paid job depends – in part – upon his or her age, educational background, and skills or training gained during past jobs.  *See* 20 C.F.R. §§404.1520(a)(4), 404.1560 – 404.1568. At the time of ALJ McNichols' decision, Plaintiff was 50 years old, placing him in the category of a person "closely approaching advanced age" for purposes of resolving his

application for benefits.  *See* 20 C.F.R. §404.1563(d).  He has a high school education.  In the past, he worked as a heavy equipment mechanic.

During an administrative hearing held by ALJ McNichols, Plaintiff testified about his health and other matters pertinent to his ability to obtain a paid job.  He testified that he is 6 feet tall and weighed 357 pounds.

Plaintiff explained that he stopped working in December 2004 when he suffered respiratory failure that required a hospitalization.  He further explained, was in a medical, I think a medication induced coma for like three months where I was just, I was out of it.  Then when I woke up they sent me to another hospital . . . ."  (Doc. #7, PageID at 77).

Between October and December 2006, after his release from hospitalization, Plaintiff attempted to work, driving a semi tractor-trailer truck but "was really unable to do the job."  (Doc. #7, PageID at 65).  He had difficulty climbing into the truck.  On one occasion he could not climb into the trailer; another time he fell out of the truck.  He was let go from that position.

Plaintiff testified that he had trouble breathing and was short of breath on a daily basis with any activity.  His trouble breathing required him to use an inhalant medication (Spiriva) once a day, which seemed to help.  He also used a BiPAP machine for sleep apnea but did not use a nebulizer or oxygen.  He smoked a pack a cigarettes each day.  (Doc. #7, PageID at 66-67).

Plaintiff testified that he experienced pain in his lower back that radiated up into his shoulder blades.  His doctors had not recommended shoulder surgery, and his treatment

had involved one sacroiliac injection that provided relief for a week.  Physical therapy was prescribed, but he could not afford it.  At the time of the ALJ's hearing, he no longer received pain injections because they were not covered by insurance.

Plaintiff also testified that he also suffered from hip pain.  His family physician told him that he would eventually need to undergo hip-replacement surgery.  His family physician advised Plaintiff that he would need "to live with it because of [his] age."  (Doc. #7, PageID at 70).  Plaintiff used a cane to help him get around.  His doctor first prescribed a cane in 2005.  By March 2010 he had obtained a new cane with his physician's prescription because his first cane had worn out.  *Id.* at 71.  Plaintiff also suffers from knee pain.  He had never seen a specialist about his knee pain.

Plaintiff described his hip and back pain as "constant."  His shoulders hurt later in the day, "off and on." (Doc. #7, PageID at 77).  When asked to rank his daily pain level on a scale of 1 (no pain) to 10 (worst pain imaginable), Plaintiff testified that his pain level on a typical day was 7 but his medication helped dull the pain.  His most comfortable position was lying down.  Medications caused dizziness and nausea.

Plaintiff estimated that he could walk 50 yards before he had to stop due to shortness of breath and back pain.  He testified that he could stand for 15 to 20 minutes, could sit for 10 to 15 minutes, and could climb steps only with help from his cane.  (Doc. #7, PageID at 79).  When asked to estimate how much he could lift "just one time," Plaintiff answered, "[p]robably 20 pounds."  *Id.* at 78-79.  He also experienced fatigue on a daily basis.

4

Plaintiff has difficulty concentrating due to depression, which he treats with medication prescribed by his family doctor.

As to his daily activities, Plaintiff had a driver's license and drove his car every day to and from stores. He did not cook, wash dishes, sweep, mop, or vacuum because his wife is "good at that . . ." (Doc. #7, PageID at 79-80). If he had to do those things, he "probably could over a period of time." *Id*. He does not wash clothes. He does not go to church or to the movies. He visits his brother-in-law every now and then, but he does not often visit friends or relatives. He sees his granddaughters (ages 4 and 6) when they come over 2 or 3 three times per week. He is not able to care for them by himself. He goes to the grocery store with his wife every once in a while.

Plaintiff tried to lose weight but did not have the stamina or endurance to exercise. He could feed, dress, and groom himself independently, although he used a shower chair and his wife helped him put on his socks.

After waking up on a typical day, Plaintiff had coffee and watched television. He then returned to bed. When he got up later, he would watch television. He would also help his wife feed her chickens, and he fed his dog. He enjoyed spending time on a CB radio, "[p]robably three hours a day." (Doc. #7, PageID at 83-84). He slept during the day about 2 to 3 hours.

### B.    <u>Medical Source Opinions</u>

Plaintiff relies on the opinion of James Thomson, D.O., his primary care physician since at least November 1999. During his treatment with Dr. Thomson, Plaintiff's

5

complaints included pain and swelling, poor sleep, numbness in his left-side of his body, shortness of breath, and an inability to exercise due to shortness of breath, hip pain, pain in both arms, and shoulder pain.  (Doc. #7, PageID at 439-64, 694-700, 724-40).  Dr. Thomson diagnosed Plaintiff as having neuropathy, osteoarthritis, degenerative-joint disease, obesity, chronic obstructive pulmonary disease, sleep apnea, tendonitis, and questionable rheumatoid arthritis.  Dr. Thomson prescribed various medications such as Neurontin, Singulair, Lyrica, Percocet, Mobic, Advil and Percocet.

Dr. Thomson completed a Cardiac Impairment Questionnaire on March 18, 2009.[2] (Doc. #7, PageID at 465-70).  He listed Plaintiff's diagnoses as COPD (chronic obstructive pulmonary disease), obstructive sleep apnea, obesity, chronic back pain, degenerative disc disease of the lumbosacral spine and right hip, and depression.  He noted that attached X-rays and lab work supported his diagnoses.  *Id.*, PageID at 466.  He further identified clinical findings in support of his diagnoses to include chest pain, edema, nausea, shortness of breath, fatigue, weakness, and sweatiness.  *Id.* at 465.  And Plaintiff's primary symptoms were fatigue, shortness of breath, right hip pain, and lower back pain with difficulty sitting, standing, and walking.  His medications included Percocet, Lexapro, Spiriva, Ambien, and Lasix.  His medication side effects included fatigue, nausea, and

---

[2]  Dr. Thomson also prepared a letter to Plaintiff's counsel on April 15, 2010, essentially opining that Plaintiff was "totally and permanently disabled."  (Doc. #7, PageID at 784).  This opinion was submitted to the Appeals Council.  *Id.*, PageID at 28.  But the Court may not consider this evidence as its review is limited to the record evidence before the ALJ.  *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007).  Also, Plaintiff has not sought a remand based on new and material evidence under Sentence Six of 42 U.S.C. § 405(g).

vertigo.

Dr. Thomson opined that Plaintiff could sit for up to 1 hour a day in an 8-hour day; stand/walk for up to 1 hour a day in an 8-hour day; lift up to 10 pounds frequently and up to 50 pounds occasionally; carry up to 20 pounds frequently and up to 50 pounds occasionally.  (Doc. #7, PageID at 467-68).  Dr. Thomson noted that Plaintiff's ability to perform full time work on a sustained basis was additionally limited by his need to avoid fumes, gases, temperature extremes, humidity, and dust; and he could not perform working requiring pushing, pulling, kneeling, bending, and stooping.  According to Dr. Thomson, Plaintiff would be absent from work more than 3 times a month as a result of his impairments or treatment.  Dr. Thomson concluded that Plaintiff's symptoms and limitations had been present since February 2006.  *Id.*, PageID at 469.

Plaintiff also relies on the opinion of Martin Fritzhand, M.D., who examined Plaintiff on at the request of the Ohio Bureau of Disability Determination (Ohio BDD) in July 2005.  (Doc. #7, PageID at 703-14).  Plaintiff reported problems with stamina and breathing.  He was 71 inches tall and weighed 316 pounds.  Dr. Fritzhand reported Plaintiff had a limping antalgic gait with the use of a cane, dyspnea on exertion, 3+ edema bilaterally in the lower extremities, absent Achilles reflexes bilaterally, and limited squatting.  Dr. Fritzhand diagnosed Plaintiff with morbid obesity, a history of acute respiratory failure, obstructive sleep apnea, hypertension, and a history of deep vein thrombosis.

Dr. Fritzhand opined that Plaintiff was incapable of even a mild amount of sitting,

7

ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy
objects.  Dr. Fritzhand noted that Plaintiff was recovering from hospitalization, was
considerably improved with regard to lung function, and was expected to progress more
over the next 2-3 months.

The Commissioner relies on the opinion of Jennifer Bailey, M.D. who examined
Plaintiff at the request of the Ohio BDD in July 2007.  (Doc. #7, PageID at 420-30).
Plaintiff weighed 327 pounds.  Dr. Bailey's examination revealed a mildly prolonged
expiratory phase, diminished breath sounds at the bases, and slightly diminished knee
range of motion.  She diagnosed morbid obesity, shortness of breath with underlying
COPD and sleep apnea, and degenerative joint disease of the knees.  Dr. Bailey thought
that Plaintiff could perform mild to moderate sitting, standing, walking, bending, kneeling,
pushing, pulling, lifting, and carrying heavy objects.

The Commissioner also relies on the opinion of Leigh Thomas, M.D., who
reviewed the file on behalf of the Ohio BDD in September 2007.  (Doc. #7, PageID at
776-83).  Dr. Thomas opined that Plaintiff could lift/carry up to 20 pounds occasionally
and up to 10 pounds frequently; stand/walk for at least 2 hours in an 8-hour workday; sit
for up to 6 hours in an 8-hour workday; and push/pull without limitation.  Plaintiff could,
according to Dr. Thomas, occasionally climb stairs and ramps but never ladders, ropes, or
scaffolds.  He could also occasionally stoop, kneel, crouch and crawl.  Dr. Thomas also
found that Plaintiff would be restricted from working in concentrated exposure to fumes,
odors, dusts, gases, and poor ventilation due to his respiratory problems.  And he could not

8

"work at unprotected heights due to body habitus."  *Id*., PageID at 780.

### C.     Vocational Expert Testimony

The ALJ's hypothetical question to the vocational expert assumed an individual who has the residual functional capacity[3] to perform a range of "light work" with a sit/stand option and the assistance of a cane.  ("Light work" involves lifting no more than 20 pounds at a time, frequent lifting of up to 10 pounds, and standing and walking for significant portions of the work day.  20 C.F.R. § 404.1567(b)).  The ALJ also asked the vocational expert to consider that the hypothetical person lacked the ability (1) to climb ladders, ropes, or scaffolds; (2) to balance; and (3) to engage in repetitive operation of foot controls or repetitive bending or twisting at the waist.  (Doc. #7, PageID at 90).  This hypothetical person could not work on uneven surfaces or while exposed to (1) concentrated amounts of irritants, (2) dangerous machinery, (3) unprotected heights, or (4) vibrations.  *Id*.   The hypothetical person could perform tasks requiring concentration for up to 15 minutes at a time.  *Id*.  Considering such a hypothetical person, the vocational expert testified that he or she could work as a mail clerk, a small parts assembler, an information clerk, or copy machine operator.  The vocational expert estimated that 10,000 such light jobs existed in the national economy.  *Id*., PageID at 90-91.

When cross-examined by Plaintiff's counsel, the vocational expert testified that an

---

[3]  A person's "residual functional capacity" refers to what the person can and cannot do despite his or her mental and physical impairments.  20 C.F.R. §404.1545; *see Howard v. Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

individual who misses work more than three times a month, on average, would be unable to maintain employment.  *Id*., PageID at 92.

### III.    "Disability" Defined, Administrative Review, and the ALJ's Decision

The Social Security Administration provides Disability Insurance Benefits (DIB) to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  Although a dispositive finding at any Step may conclude the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review answers five questions:

1.    Is the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.    Considering the claimant's age, education, past work experience, and

residual functional capacity, can the claimant perform other work
available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

ALJ McNichols found as follows:

Step 1:  Plaintiff meets the insured status requirements of the Act through March

31, 2011.  Plaintiff has not engaged in substantial gainful activity since January 18, 2005.

Step 2:  Plaintiff's severe impairments included chronic obstructive pulmonary

disease; degenerative disc disease of the lumbar spine; osteoarthritis of the right hip;

bilateral degenerative joint disease of the knees; osteoarthritis of the shoulders; obesity;

and a history of depression.

Step3:  Plaintiff did not have an impairment or combination of impairments that met

or equaled the level of severity described in the Listings, 20 C.F.R. Subpart P, Appendix 1.

Step 4:  Plaintiff's Residual Functional Capacity consisted of his ability to perform

a limited range of light exertional work featuring the use of a cane to ambulate and the

opportunity to alternate positions between sitting and standing at 30-minute intervals

throughout the workday.  He could never climb ladders, ropes, or scaffolds; balance or

work on uneven surfaces; perform repetitive use of foot controls; and perform repetitive

bending or twisting at the waist.  He must avoid concentrated exposure to irritants and all

exposure to hazards and vibrations.  He could not maintain concentration on a single task

for longer than 15 minutes at a time due to his mental impairment.  He was unable to

perform his past relevant work.

Step 5:  Considering Plaintiff's age, education, work experience, and Residual Functional Capacity, jobs existed in significant numbers in the national economy that Plaintiff could perform.

The ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and hence not eligible for DIB.  (Doc. #7, PageID at 39-53).

## IV.    **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines:  "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Commissioner of Social Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Commissioner of Social Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence

12

consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Commissioner of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

V.      **Discussion**

A.      **The Parties' contentions**

Plaintiff argues that the ALJ failed to follow the treating physician rule and thus erred by placing little weight on the opinion from his treating physician, Dr. Thomson. Plaintiff further contends that the ALJ erred by rejecting the opinions of examining physician Dr. Fritzhand because the record fails to support Dr. Fritzhand's prediction that Plaintiff might improve over time.  According to Plaintiff, the ALJ's analysis "simply pits his own lay interpretation of the clinical and objective findings" against the interpretation of the medical source opinions.  (Doc. #8, PageID at 797).

Plaintiff also argues that the ALJ failed to follow the Regulations when he credited a later examining physician, Dr. Bailey, and a non-examining physician, Dr. Thomas, based on the vague finding that the opinions were supported by "substantial medical evidence of record."  *Id*, PageID at 799.

The Commissioner maintains that the ALJ reasonably evaluated the medical source opinions of record and fully explained why he did not rely on Dr. Thomson's opinions. The Commissioner argues that certain evidence of record supports the ALJ's decision and the Plaintiff's testimony about his daily activities did not support the level of restriction set by Dr. Thompson.  The Commissioner further contends that the ALJ correctly gave greater weight to Dr. Bailey's opinions than to Dr. Thompson's opinions, and the ALJ referred to Dr. Thomas' opinions as an appropriate basis for not fully crediting Dr. Thompson.

14

### B. Medical Source Opinions

### 1.
### Treating Medical Sources

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. Under the treating physician rule, a treating physician's opinion is given controlling weight when it is both well supported by medically acceptable data and "not inconsistent with other substantial evidence" of record. 20 C.F.R. §404.1527(D)(2); *see Blakley,* 581 F.3d at 406; *see also Wilson*, 378 F.3d at 544.

When an ALJ finds that a particular physician's opinions are not entitled to controlling weight under the treating physician rule, the ALJ may not end the evaluation. The ALJ must further evaluate the treating physician's opinions under a number of regulatory factors, "including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see* 20 C.F.R. §404.1527(d)(2)-(5).

### 2.

15

## **Non-Treating Medical Sources**

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p 1996, WL 374180 at *2-*3.

### C. **Discussion**

The ALJ correctly described the legal standards applicable to weighing opinions provided by treating medical source, *see* Doc. #7, PageID at 50-51, and in doing so, did not err as a matter of law. Judicial review of the ALJ's decision thus turns to his application of those legal standards to Dr. Thomson's opinions.

The ALJ declined to give controlling weight to the opinions of Plaintiff's treating physician, Dr. Thomson, explaining in part:

> Dr. [Thomson]'s conclusions are unsupported by objective signs and findings upon examination, as his treatment notes primarily consist of the claimant's subjective complaints and his diagnoses and prescriptions, yet

16

they contain few examination findings.  Further, the relatively moderate
findings upon the objective imaging and the claimant's reports of daily
activities, as discussed above, do not support Dr. [Thomson]'s limitations.

(Doc. #7, PageID at 51)(internal citations omitted).

At best for the Commissioner, the ALJ's brief reasoning indicates that he

considered Dr. Thompson's opinions under factors applicable to determining whether his

opinions were due controlling weight under the treating physician rule.  The ALJ's

reasoning, however, contains no indication that he evaluated Dr. Thompson's opinions

under the remaining factors – "the length of the treatment relationship and the frequency

of the examination, the nature and extent of the treatment relationship, supportability of

the opinion, consistency of the opinion with the record as a whole, and any specialization

of the treating physician." *Blakley,* 581 F.3d at 406  – as the Commissioner's Rulings, and

case law require.  "When the treating physician's opinion is not controlling, the ALJ, in

determining how much weight is appropriate, must consider a host of other factors,

including the length, frequency, nature, and extent of the treatment relationship; the

supportability and consistency of the physician's conclusions; the specialization of the

physician; and any other relevant factors.  However, in all cases there remains a

presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to

great deference, its non-controlling status nothwithstanding."  *Rogers*, 486 F.3d at 242; *see*

*Wilson*, 378 F.2d at 544.  In addition, the ALJ selected normal examination findings from

various parts of Dr. Thompson's office notes but overlooked or ignored the abnormalities

found during examinations including chest pain, edema, nausea, shortness of breath,

fatigue, weakness, and sweatiness. *See, e.g.*, Doc. #7, PageID at 439-42, 465-66, 696, 726. And, Dr. Thompson did more than blindly credit Plaintiff's subjective reports of his symptoms, as the ALJ implied; Dr. Thompson relied on Plaintiff's x-rays and laboratory test results. *See, e.g.,* Doc. #7, PageID at 435-36. The ALJ, moreover, relied on his own lay reading of Plaintiff's objective imaging as a reason for rejecting Dr. Thompson's opinions without explaining whether another medical source reviewed Plaintiff's objective imaging and described the results as "moderate," as the ALJ did. (Doc. #7, PageID at 51).

The ALJ and the Commissioner are correct in recognizing that the ultimate decision of disability is one reserved to the Commissioner. Therefore, to the extent that Dr. Thomson concluded Plaintiff was disabled, the ALJ was not bound to accept his opinion on the ultimate-disability issue. Nevertheless, the fact that a treating physician expresses an opinion about a plaintiff's disability status says nothing about the factors applicable to weighing the physician's opinions under 20 C.F.R. §404.1527(d).

The ALJ's rejection of the limitations suggested by Dr. Thomson and his conclusion that Plaintiff has the Residual Functional Capacity to perform a range of light exertional work is not supported by substantial evidence in the record as a whole. There is no question that the ALJ relied heavily, if not exclusively, on the examination findings of Dr. Bailey and the single Residual-Functional-Capacity form completed by Dr. Thomas. (Doc. #7, PageID at 420-30, 776-83). But the ALJ failed to evaluate the opinions of these non-treating physicians under any factor required by the Regulations. The ALJ's decision neither considers nor mentions the supportability or consistency of Dr. Bailey's or Dr.

18

Thomas' opinions and does not refer to any other factor, such as specialization, when discussing these physician's opinions.  *See* Doc. #7, PageID at 49-50.  This constituted a failure to apply the correct legal criteria because the Regulations and Rulings required the ALJ to weigh the opinions of one-time examining physicians and record-reviewing physicians under the regulatory factors, including supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180 .  The Regulations appear to emphasize this requirement by reiterating it no less than three times.  *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see also* 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

Despite the ALJ's error in relying on a record review by consulting physicians, Defendant argues that this Court should nevertheless uphold the Residual Functional Capacity findings by the ALJ based on the numerous inconsistent statements by Plaintiff regarding his activities of daily living.  *See* 20 C.F.R. §404.1529(c)(v); (Doc. # 11, PageID at 826) (noting that Plaintiff had returned to work as a truck driver for a period of time after his 2005 hospitalization, could mow the lawn without shortness of breath in 2005, and could perform housework and shopping.  In November 2007, Plaintiff reported going hunting and went out on a boat)(citation to record omitted).  Such inconsistencies do not negate the ALJ's reliance on Dr. Bailey's opinions without evaluating those opinions as

19

the Regulations mandate.

Accordingly, Plaintiff's Statement of Errors is well taken.[4]

## VI.   **Remand Is Warranted**

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42

U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501

U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous

principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of

H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the

evidence of disability is not overwhelming, and because the evidence of a disability is not

strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social

Security Administration pursuant to Sentence Four of §405(g) due to problems set forth

above.  On remand, the ALJ should be directed to (1) re-evaluate the medical source

---

[4]  In light of the above review, and the resulting need for remand of this case, an in-depth analysis
of the parties' contentions about Plaintiff's credibility is unwarranted.

opinions of record under the legal criteria set forth in the Commissioner's Regulations,

Rulings, and as required by case law; and (2) reconsider, under the required sequential

evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB.

      Accordingly, the case should be remanded to the Commissioner and the ALJ for

further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Jerome Capps was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.


April 26, 2012                                 s/Sharon L. Ovington
                                              Sharon L. Ovington
                                         United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).